UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| v. ) | No. 24-CR-10363-IT |
| LIFENG WU ) | |
|     Defendant ) | **(REDACTED VERSION)** |
| ) | Leave to file granted on |
| ) | October 2, 2025, Dkt. 60 |

# SENTENCING MEMORANDUM ON BEHALF OF LIFENG WU

    Born into extreme poverty in rural China, Mr. Wu was raised primarily by his grandmothers because his parents were emotionally unavailable and abusive – including an often-violent father. From a young age he cared for his younger siblings, labored on the family farm, and endured chronic food shortages all while excelling in school. He rose to the top of his class, earned admission to a prestigious university, and began a promising career at the Chinese Ministry of Foreign Affairs until an epilepsy diagnosis cut that path short. At 24, with nothing to his name, he came to the United States, earned two master's degrees, and through hardship and persistence built a stable family life with his wife and their two sons. The letters before the Court uniformly portray a man shaped by hardship yet defined by integrity: a caring and supportive spouse, an involved father, an empathetic and dependable friend, and someone who routinely performs good deeds, large and small, without any expectation of return.

    The issue presented here, as in all sentencing proceedings, is "what" punishment is fair, necessary, and appropriate, given all the relevant facts and circumstances; or, in the words of 18

1

U.S.C. § 3553(a), what sentence is "sufficient, but not greater than necessary," to serve enumerated sentencing goals. For all the reasons detailed herein, as well as those to be presented at sentencing, the defense respectfully requests this Honorable Court to impose a sentence of time served (33 days), followed by a term of supervised release with a condition of home confinement and continued treatment, consistent with the recommendations in the sealed portion of this memorandum. In the alternative, the defense asks the Court to impose a sentence of no more than six months' imprisonment.

While such a sentence is below the advisory guideline range as calculated by Probation, and below the recommendation of the government, the defense respectfully submits that it constitutes a gravely serious punishment – one that sends a very serious message to both Mr. Wu and the community at large; accounts for the nature of his criminal conduct; is not inconsistent with sentences imposed on coconspirators in *United States v. Zhang et. al.*, Dkt. 22-cr-10185-IT, who plead guilty to drug and money laundering offenses as well as the regulatory offense of conducting an unlicensed money-transmitting business; recognizes Mr. Wu's significant post-offense rehabilitation; acknowledges the substantial toll this prosecution has taken on him and his family; and weighs the collateral consequences likely to follow, including a bar on his return to the United States, where many friends remain and where his U.S. citizens sons may one day reside.

Pursuant to this Honorable Court's Procedural Order, Dkt. 53, the defense respectfully advises this Honorable Court that it substantively objects to Probation's application of the two-level enhancement pursuant to USSG §2S1.3(b)(1)(A)&(B) because there is insufficient evidence that Mr. Wu engaged in bulk cash smuggling or that he knew or believed that the funds

2

Mr. Zhang was transmitting were the proceeds of unlawful activity. As discussed *infra* at 7–8, Mr. Wu transacted exclusively by bank wire; he never dealt in cash; and was repeatedly assured by Mr. Zhang that his "sources of money are clean and stable." The defense does not believe an evidentiary hearing is required and is otherwise seeking a variance under 18 U.S.C. § 3553(a).

## I.   RELEVANT BACKGROUND AND CIRCUMSTANCES

### A.   *Personal and Family Background.*

Mr. Wu was born in 1974 in rural Zhejiang Province, China, and came of age amid poverty and social stigma that marked him and his extended family for generations. *See* Letter of Lifeng Wu, attached hereto as Exhibit 1; PSR at ¶¶50-51. Because Chinese authorities blamed Mr. Wu's family for his grandfather's loyalty to the Nationalists during World War II and the ensuing civil war, Mr. Wu's father was expelled from medical school – extinguishing his medical career – and his mother's opportunities were likewise curtailed. PSR at ¶50. The family was thus relegated to rice farming. *Id.* As he writes in his letter, "[p]overty framed every corner of our lives. I cooked my first meal at the age of four, and we ate meat only once or twice a year." Exhibit 1 (filed partially under seal); *see also* PSR at ¶51 ("The defendant recalled not having heat in their house and not having proper shoes during winter, which would cause cysts to form on his hands and feet."). In one memory that "has never left" him, the family "even ate [his] dog – [his] closest companion in childhood," which is what he discovered when he "lifted the lid of the cauldron and saw what was cooking." Exhibit 1. That experience, and others like it, left him with a lifelong understanding of deprivation and "how fragile trust can be," shaping his commitment to "choose honesty and integrity above all else." Exhibit 1.

3

From an early age he shouldered adult responsibilities for his younger siblings. His sister recalls that they "grew up largely under the care of [their] elder brother. He managed the small details of [their] daily life, taught [them] basic skills, and even helped shoulder farm work," including carrying "heavy bundles of rice back from the fields." Letter of XiaoJun Wu, attached hereto as Exhibit 3. William, his eldest son, similarly describes a father who "grew up…working long hours on a soy farm while dedicating himself to his studies," rising to the top of his class through "extraordinary work ethic and determination." Letter of William Wu, attached hereto as Exhibit 4.

Despite hardships in his early life, Mr. Wu excelled academically, graduating near the top of his class and earning admission to Zhejiang University. After graduation, he secured a coveted position at the Ministry of Foreign Affairs. An epilepsy diagnosis, however, forced him to leave public service, abruptly ending a diplomatic track and foreclosing the overseas postings he had trained for. Exhibit 1 and Letter of Ye Yuan, attached hereto as Exhibit 5. That early setback, compounded by childhood scarcity and responsibility, reinforced both humility and resilience that would shape the decades that followed. Exhibit 1; *see also* Letter of Mei Tian, attached hereto as Exhibit 2.

At age 24, Mr. Wu left China for the United States to pursue graduate study, first at UMass–Dartmouth, then at Arizona State University, ultimately earning both an M.B.A. and an M.S. in Information Systems Management. Exhibit 1. He met his future wife, Mei (Robin) Tian, in 2000; they married in 2002 and raised two sons, William, born in 2003, and Maximilian, born in 2004. Exhibit 2. The young family's early years were difficult. Financial strain and Ms. Tian's postpartum depression culminated in the painful decision to send the boys temporarily to

4

grandparents in China while Mr. Wu stabilized his career. Exhibit 2; Exhibit 1. In 2009, the family relocated to Canada, where Mr. Wu and Ms. Tian are citizens today and continue to reside.  PSR at ¶¶ 52–53.

Professionally, through great difficulty and determination Mr. Wu built a steady career as an IT consultant across North America, most recently with IBM Canada. PSR ¶¶ 59–62. Colleagues and clients describe a principled and service-oriented man. Tony Pileggi, a long-time client, writes that Mr. Wu "exemplified the determination of a new immigrant who succeeds through hard work and integrity…[and] carried himself with dignity." Letter of Tony Pileggi attached hereto as Exhibit 6. Ben Andrews, a colleague, recalls Mr. Wu's "integrity, kindness, and compassion," including steadfast support during the loss of Mr. Andrews's child. Letter of Ben Andrews attached hereto as Exhibit 7. Matthew Wolf, a friend of 25 years, attests that Mr. Wu "has always been a committed father…a tireless source of ideas for how to improve himself – for the betterment of those he loves." Letter of Matthew Wolf attached hereto as Exhibit 8.

Those who have known Mr. Wu since childhood echo the same themes. His sister recalls that, even as a boy, he "stood firm" on principle, returning a large sum of found money "intact," despite family need, revealing an "extraordinary, innate quality []: not to be tempted by what does not belong to you." Exhibit 3. His brother describes Mr. Wu as "the pride of our whole village," admired for both "intelligence" and "character," whose story continues to "inspire[] young people from our hometown." Letter of Liyuan Wu, attached hereto as Exhibit 9.

Friends likewise recount Mr. Wu's selfless generosity: midnight house repairs in sub-zero temperatures, helping single parents move furniture in 110°F Phoenix heat, and years of youth leadership through Boy Scouts Canada. *See* Letter of Minghua Yang, attached hereto as Exhibit

5

10; Letter of Yingzi Du, attached hereto as Exhibit 11; Letter of Dezhi Liu, attached hereto as Exhibit 12. Ms. Tian adds that when their sons joined the Boy Scouts, Mr. Wu "underwent years of training to qualify as a Scout leader so he could support their activities." Exhibit 2. The PSR reports no criminal history and likewise documents Mr. Wu's role as a devoted husband and father to two college-aged U.S.-citizen sons. PSR at ¶¶ 43-45, 53.





C.  *Offense Conduct*

While Mr. Wu does not, in any respect, seek to depreciate or minimize the gravity of his offense, he does seek to place his conduct in the proper context, including the fact that he did not intend to become a money exchanger for criminal enterprises. Mr. Wu's money-exchange activity began as informal assistance helping Chinese clients pay FedEx, UPS, and DHL invoices in U.S. dollars. Exhibit 1. He later helped legitimate Chinese citizens transfer funds for expenses and investments in the United States and "education groups that need[ed] to pay tuition for students overseas." PSR at ¶ 14. He never accepted cash and used reputable, mainstream banking institutions like JP Morgan and Citizens, rather than other lightly regulated organizations. In 2022, Mr. Wu met Mr. Zhang, who assured him that his "sources of money are clean and stable," explaining that the funds came from lawful sales of Apple products and profits from arbitraging

7

price differences between the United States, China, and the UAE. To bolster those assurances, Mr. Zhang took Mr. Wu to his New England warehouses that contained inventory for the business and explained that the absence of sales tax in New Hampshire was part of the purported pricing strategy. The payments Mr. Wu received from Dubai-based companies were consistent with that story. The contemporaneous text messages where Mr. Zhang sends incorporation documents, discusses price differences between countries, and requests assistance in setting up freight shipping accounts, independently corroborate that understanding.[1] Mr. Wu accepts that ignorance is no excuse, but the record shows his purpose in operating this money exchange business was not to facilitate crime.

   D. *Post-offense Conduct.*

Mr. Wu acknowledges that he has made mistakes in his life. He finds himself convicted of a serious offense that he fully takes responsibility for. He and his family have felt the weight of this case, both financially and emotionally, and Ms. Tian reports "profound change": Mr. Wu has shown "deep remorse" and she believes "he will never put himself, or us, in such a situation again." Exhibit 2. Mr. Wu is addressing his anxiety and depressive symptoms in counseling, which he plans to continue. His treating psychologist notes he "reliably attends…actively participates," shows "a high level of motivation and self-reflection," and is "receptive to feedback." Letter of Melissa Johnson attached hereto as Exhibit 13. Importantly, Mr. Wu's own words capture his mindset today:

> I have learned that shortcuts lead only to destruction. True success lies in integrity, prudence, and service to others. I want to live as a warning to others — especially young men tempted by quick

---

[1] Mr. Wu declined offers to launder illicit funds – including, at one point, approximately $30 million in marijuana proceeds – stating that he did not want to engage in illegal conduct.

> money. I want my life to testify that crime does not pay, that it destroys, and that only truth and integrity endure.
>
> ***
>
> Your Honor, I accept full responsibility for my actions. I regret deeply the harm I caused, even though I never intended to damage society. I am grateful to America, which I consider my first adoptive country, and to Canada, my second.
>
> I humbly ask for your compassion and leniency as you weigh my sentence. I do not ask to escape consequences but to be allowed the chance to continue being useful — to my family, to my community, and, if possible, to this country.
>
> I want to spend the rest of my life living with honesty, prudence, and integrity. I want to share my story in churches and communities as a warning against the path I took. I want my sons to see that even when a man falls, he can rise again by God's grace and by commitment to truth.

Exhibit 1. Friends and community members corroborate this transformation. *See e.g.,* Exhibit 8 ("Mr. Wu "expressed sincere regret"). Reverend Kaihong Duan, Mr. Wu's pastor, writes that Mr. Wu has spoken "with sincere repentance and wants to be transformed," viewing this experience as a lesson to live "with honesty and caution" and to "testify…about the dangers of straying from integrity." Letter of Reverend Duan attached hereto as Exhibit 14; *see* additional letters, attached hereto as Exhibit 15.





**II.    ARGUMENT**

10

Supreme Court and First Circuit precedents confer broad discretion on this Honorable Court to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007). "[O]nce the guidelines sentencing range [GSR] is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the guidelines sentencing range based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008) (citation omitted).

What punishment should properly be imposed upon an individual ultimately rests upon a complicated analysis of the individual involved: what punishment has already been inflicted, are they likely to engage in recidivist behavior, have they been rehabilitated or are they particularly receptive to rehabilitation, and whether incarceration will significantly further the goals of sentencing. It is a complex matrix of factors, ultimately dependent upon the individual human being at issue, which is precisely why our criminal justice system has vested this Court with discretion to differentiate and individualize sentencing.

The issue here becomes what is the most appropriate sentence in this case, given Mr. Wu's conduct and the facts and circumstances of his life. The defense respectfully requests a sentence of time-served (33 days), a term of supervised release with a condition of home confinement and continued treatment, consistent with the recommendations set forth in the sealed portion of this memorandum. In the alternative, should this Honorable Court deem a longer custodial term necessary, the defense asks that it not exceed six months.

<u>First</u>, the guidelines calculation here is driven not by Mr. Wu's moral culpability but by the "value of the funds" proxy imported through §2S1.3's cross-reference to §2B1.1's loss table.

That proxy severely overstates the seriousness of unlicensed money-transmission offenses. A money exchanger typically earns a thin spread, often one percent or less, whereas a fraudster or a direct/secondary money launderer captures the illicit proceeds themselves or, at minimum, a far larger percentage of them.

The distortion is magnified by the cliff effect. Here, the calculation sits just over the $25 million bracket; had the aggregate been slightly less, the guideline calculation would drop by two levels. Mr. Wu committed no fraud or scheme to defraud, and he did not knowingly conceal or promote Mr. Zhang's underlying conduct. Lumping his conduct with fraud schemes under §2B1.1 thus yields an advisory range far greater than necessary.

Courts have repeatedly recognized this problem and varied downward where §2B1.1's dollar-driven arithmetic overstates culpability. *See United States v. Gupta,* 904 F. Supp. 2d 349, 350–51 (S.D.N.Y. 2012) (sentencing should reflect "a large complex of facts and factors," warning that the Guidelines' loss focus can produce "irrational" results); *See United States v. Johnson,* No. 16-CR-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (imposing 24-month sentence despite GSR of 87-108 months, and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (sentencing defendant to three and one-half years despite guideline range of life imprisonment and noting "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

Notably, the Sentencing Commission has publicly announced it is reexamining §2B1.1 to ensure the guideline better tracks individual culpability and harm, including reassessing the roles of actual loss, intended loss, and gain and considering revisions to the loss table. *See* https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-proposed-2025-2026-priorities.

Given these concerns, this Honorable Court should place greater weight on §3553(a) factors, such as Mr. Wu's non-fraud offense conduct, the minimal profit inherent in unlicensed exchange, his background and treatment needs, and the absence of identifiable victims to impose a variant sentence "sufficient, but not greater than necessary."

Second, there is simply no need to subject Mr. Wu to more incarceration to specifically deter him. When the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance may be warranted. *See United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (holding that "a custodial sentence [wa]s unnecessary" because the defendant's criminal conduct appeared to be an "'aberration' from his otherwise lawabiding life"). The defense respectfully contends that such variance is warranted here. Mr. Wu is a true first-time offender. Indeed, Mr. Wu has never been incarcerated and has had no interaction with law enforcement for his entire life. From a sentencing perspective, this fact is important. There is "a demonstrable difference in the recidivism rates of real first-time offenders as compared to other defendants in Criminal History Category I." United States v. Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citation omitted); see also Amendments to the Sentencing Guidelines at 52, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-

13

amendments/202305_Amendments.pdf ("Recidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."). Moreover, Mr. Wu has not only accepted responsibility for his actions but put all his efforts into attempting to remediate the harm he has caused.

To the extent there is a need for general, as opposed to specific deterrence, that need has been satisfied by the publicity stemming from this case and other similar cases. *See* PSR at ¶8. As studies have shown "it is the 'certainty of apprehension and not the severity of the legal consequence ensuing from apprehension' that is a more effective deterrent." *United States v. Walker*, 252 F. Supp. 3d 1269, 1297 (D. Utah 2017), *aff'd*, 918 F.3d 1134 (10th Cir. 2019) (*quoting* Daniel S. Nagin, Deterrence in the Twenty–First Century, Crime and Justice in America: 1975–2025, at 202 (2013)) (emphasis in original). Thus, "general deterrence comes from better visibility of policing, which increases certainty of punishment, rather than increasing the severity of punishment on the back end." *Id.* Given the extensive publicity surrounding the prosecutions stemming from government's investigation, anyone paying even an iota of attention is aware that the government will vigorously pursue similar conduct. No rational human being, including Mr. Wu, would willingly subject themselves to the hardships he has endured over the past several years that are documented in the sealed portions of this memorandum and in exhibits 16 and 17.

Third, Section 3553 requires courts to consider "the kinds of sentences available" and "the need for the sentence imposed . . . to provide the defendant with needed … medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §§ 3553(a)(3), (a)(2)(D).

14

It is unlikely that Mr. Wu will receive necessary medical treatment in BOP custody. As detailed in the sealed section of this memorandum, his medical needs are significant and even a short term of imprisonment risks exacerbating his existing conditions.

Furthermore, if Mr. Wu is sentenced to confinement and placed into BOP custody, he will be ineligible for placement at an FPC. Instead, he will be confined in a substantially more restrictive and hazardous setting than is necessary. BOP Program Statement 5100.08 provides that deportable aliens "shall be housed in at least a Low security level institution." Program Statement 5100.08, c. 5, at 9, available at https://www.bop.gov/policy/progstat/5100_008.pdf. He will also be unable to access the ordinary benefits of prerelease custody contemplated by 18 U.S.C. § 3624(c)(1), which directs BOP, to the extent practicable, to ensure that prisoners spend a portion of the last months of their sentence (up to 12 months) in conditions that facilitate reentry. Although § 3624(c)(2) authorizes up to six months of home confinement – and encourages maximizing that period for low-risk prisoners – Mr. Wu's alienage forecloses both minimum-security placement and community confinement.

Through no fault of his own, these collateral restrictions will render his punishment far more severe than that of similarly situated U.S.-citizen defendants. *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (noting that convicted alien would serve "harsher time because [he would] not be eligible for halfway house placement").

If sentenced to imprisonment, Mr. Wu will likely endure additional confinement while he is transferred to ICE custody and while removal arrangements between the United States and Canada are made. His conviction will also likely bar his return to the United States, where many of his friends reside and where his sons, as U.S. citizens, may live in the future.

15

"[T]he guidelines did not take into account the possibility that a defendant's alienage might significantly transform the severity of the entire length of his sentence, especially if the sentence is for an offense that is in no way intrinsically related to immigration." *United States v. Bakeas*, 987 F. Supp. 44, 50 (D. Mass. 1997) ("Both the inappropriate severity of the sentence, and the fact that it is due solely to Bakeas' non-citizenship, make a downward departure proper in this case."). For these reasons, the defense respectfully contends that a downwards departure or variance is warranted and that a sentence of time-served should be imposed. *See* U.S.S.G. § 5K2.0. (allowing sentencing court to depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.").

Finally, the sentence advocated here in would be consistent with, rather than disparate from sentences imposed by this Honorable Court and elsewhere. In related cases, *United States v. Zhang, et. al.*, Dkt. 22-cr-10185-IT, this Honorable Court imposed the following sentences:

| CASE | SENTENCE | SUMMARY |
|---|---|---|
| *United States v. Chengzou Liu, Dkt. 22-cr-10185-IT* | 24 months incarceration | Chengzou Liu pled guilty to both money laundering and marijuana trafficking. Chengzou "was a prolific marijuana trafficker – dealing hundreds of pounds of marijuana during the course of this investigation – and generated hundreds of thousands of dollars in illicit proceeds that [he] laundered with his co-conspirators." Dkt. 165 at 2. |
| *United States v. Da Zeng, Dkt. 22-cr-10185-IT* | 1 year and a day + 3 months home confinement | Da Zeng pled guilty to both unlicensed money transmission and money laundering. In his role Da Zeng "connect[ed] the leaders [Shi Rong Zhang and Qiu Mei Zeng] to an important source of bulk cash to facilitate their unlicensed money transmitting business," which he knew "represented drug proceeds as well |

| | | |
|---|---|---|
| | | as proceeds from COVID-relief fraud." Dkt. 236 at 3. Furthermore, Da Zeng "served as a 'shopper' on numerous occasions" for Shi Rong Zhang, where he knowingly used gift cards funded by illegal proceeds to purchase Apple products. *Id.* at 4. |
| *United States v. Qiu Fang Zeng,* Dkt. 22-cr-10185-IT | 3 months incarceration + 3 months home confinement | Qiu Fang was "the most culpable of the three siblings" in a "prolific unlicensed money transmitting business" that moved "millions of dollars over the course of just the few months that agents happened to be intercepting [] telephones". Dkt. 238 at 8; Dkt. 265. Qiu Fang "ran the bank inside China Gourmet [and] [w]hen her brothers delivered carloads of U.S. currency, she counted it and doled it out to the various customers of this enterprise." Dkt. 238 at 9. |
| *United States v. Wei Qing Zeng,* Dkt. 22-cr-10185-IT | 3 months incarceration + 3months home confinement | "Wei Qing traveled from Boston to New York to retrieve hundreds of thousands of dollars of bulk U.S. currency" that he "knew" "constituted proceeds of illegal activity or would be used to promote illegal activity," specifically marijuana trafficking and hid the funds in his car "inside boxes of frozen meat products". Dkt. 221 at 2-4. |

By contrast, Mr. Wu did not engage in marijuana trafficking, did not handle bulk cash, and, unlike several of the above defendants, did not know the funds he transmitted for Mr. Zhang were derived from illicit activity. Further, while the dollar amounts attributed to some co-defendants may appear lower, that is largely a function of untraceable cash. Mr. Wu's transfers, by contrast, were fully traceable through bank records, which inflates the guideline calculus without necessarily reflecting greater culpability.

17

Likewise, the requested sentence would be consistent with outcomes in other large-scale unlicensed money-transmission cases, where defendants, even more culpable than Mr. Wu, received non-custodial sentences. For example, the founder and operator of "E-gold", a "digital currency" that allowed users to open "accounts with obviously bogus and false contact information, including accounts in the name of 'Mickey Mouse'" and unlawfully transmit more than $50+ million to a non-custodial sentence. *United States v. E-Gold, LTD, et. al.* Docket No. 07-cr-00109, Indictment, Dkt. 1 at 6, 7, and 8 (DDC). The defendant knew "E-gold" was being used by child pornographers and other fraudsters but continued running the operation. *Id.*, Government Sentencing Memorandum, Dkt. 174 at 2-3 ("When agents executed a search warrant at E-gold's business office in December 2005, they found internal records showing that E-gold had identified more than 3,000 accounts involved in buying or selling child pornography, more than 13,000 accounts involved in various types of investment scams, and more than 3,000 accounts involved in credit card fraud."). For his conduct, Douglas Jackson, the principal owner, following a plea and cooperation with the government was sentenced to time served. *Id.*, Judgment, Dkt.189 at 2. *see also United States v. Hayes et. al.*, Dkt. 20-cr-500, Dkt. 334 at 1 and 5 (S.D.N.Y) (probationary sentences for owners and operators of BitMEX, one of the largest cryptocurrency derivatives platforms in the world for enabling "its users [which included criminals] to transact trillions of dollars anonymously…").[2]

---

[2] BitMEX allowed customers to register accounts with "only an email address" enabling them to anonymously conduct "at least $209 million worth of transactions with known darknet markets or unregistered money services businesses providing mixing services." FinCEN announces $100 million enforcement action against Unregistered Futures Commission merchant BitMEX for Willful Violations of the bank secrecy act, FinCEN.gov (2021), https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures. "[S]enior leadership" later covered up the conduct by altering "U.S.

Mr. Wu understands the seriousness of his conduct and the charges against him; however, he is also a clear example of someone who has the capacity and desire for redemption and transformation. Mr. Wu deeply regrets his actions and has demonstrated sincere remorse. The requested sentence is not inconsistent with sentences for similarly situated defendants and would also provide him with the opportunity for rehabilitation and the treatment that he needs.

## III.    CONCLUSION

For the reasons discussed herein, the defense respectfully submits that a sentence of time served (33 days), followed by a term of supervised release with a condition of home confinement and continued treatment, consistent with the recommendations in the sealed portion of this memorandum is just, proportionate, and consistent with the aims of 18 U.S.C. § 3553(a). Such a disposition honors the gravity of the offense while recognizing Mr. Wu's demonstrated rehabilitation, his record of exemplary conduct outside this transgression, the positive role he continues to play in the lives of his family and community, and his current medical needs.

Respectfully Submitted,

Lifeng Wu
By his attorney,

*/s/ Martin G. Weinberg*
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza
Suite 1000
Boston, MA 02116
(617) 227-3700

---

customer information". *Id.*

## CERTIFICATE OF SERVICE

  I hereby certify that a true copy of this document was served on all counsel of record this day, October 2, 2025, via ECF.

            */s/ Martin G. Weinberg*
            Martin G. Weinberg, Esq.